```
            UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


DOUGLAS L. TROUT, SR., and       :   CIVIL NO. 1:07-CV-0431
VICKIE L. TROUT, husband and     :
wife,                            :   (Judge Conner)
                                 :
            Plaintiffs           :   (Magistrate Judge Smyser)
                                 :
       v.                        :
                                 :
THE MILTON S. HERSHEY MEDICAL    :
CENTER, et al.,                  :
                                 :
            Defendants           :
```

**REPORT AND RECOMMENDATION**

I. Background and Procedural History.

On March 6, 2007, the plaintiffs, Douglas L. Trout, Sr. and his wife Vickie L. Trout, commenced this action by filing a complaint.

The defendants named in the complaint are: the Milton S. Hershey Medical Center (MHMC), Reza Miraliakbari, M.D., Timothy Shane Johnson, M.D., and Douglas Justin McGuirk, M.D.

This a medical malpractice action.  The plaintiffs contend that the defendants were negligent in connection with a surgery on plaintiff Douglas Trout's right leg.  More

specifically, the plaintiffs claim that the defendants negligently attached an artery from a latissimus dorsi free flap to a vein (rather than an artery) in plaintiff Douglas Trout's right leg and failed to subsequently identify and correct that mistake which resulted in plaintiff Douglas Trout having his right leg amputated below the knee.

On May 4, 2007, defendant McGuirk filed an answer to the complaint, and on May 14, 2007, defendants MHMC, Miraliakbari and Johnson filed an answer to the complaint.

On November 19, 2007, defendant McGuirk was dismissed from this action by way of a stipulation of dismissal.

The discovery period ended on January 14, 2008.  *See Doc. 37.*

On February 29, 2008, the deadline set by the amended case management order for the filing of dispositive motions, defendant Johnson filed a motion for summary judgment, a statement of facts, a brief and documents in support of his motion.  On March 13, 2008, the plaintiffs filed a brief and

2

documents in opposition to the motion for summary judgment.  No reply brief has been filed.

The case is on Judge Conner's September 2008 trial list.

II.  Summary Judgment Standard.

Summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may discharge that burden by "'showing'-- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its

pleading; rather, the nonmoving party must "set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e).

An issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph*, 842 F.2d 689, 693-94 (3d Cir. 1988) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A material factual dispute is a dispute as to a factual issue that will affect the outcome of the trial under governing law. *Anderson*, *supra*, 477 U.S. at 248. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, supra*, 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential

4

element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002)(quoting *Celotex, supra*, 477 U.S. at 323).

III. Undisputed Facts.

      The following facts are not in dispute for purposes of the pending motion for summary judgment.

      Plaintiff Douglas Trout was involved in a motorcycle accident on September 24, 2005 in which he sustained multiple traumatic injuries including fractures of every bone in his right leg and an extensive soft tissue degloving injury to his right lower leg and the top of his foot. *Doc. 48, Defendant Johnson's Statement of Facts at ¶1.*[1] Following the accident, Mr. Trout was initially transferred to the York Hospital for treatment. *Id. at ¶2.* However, because he required more specialized care not available at York Hospital, he was transferred to the MHMC on September 26, 2005 for treatment. *Id.*

---

[1] The plaintiffs have not filed a response to defendant Johnson's Local Rule 56.1 Statement of Facts. Pursuant to Local Rule 56.1, the material facts set forth in defendant Johnson's Statement of Facts are deemed to be admitted.

One of Mr. Trout's most challenging injuries involved the extensive degloving injury to his right lower leg, in which there was significant stripping of the soft tissues, exposed tibial bone, and near circumferential skin loss. *Id. at* ¶3. MHMC attending plastic and reconstructive surgeon defendant Miraliakbari evaluated Mr. Trout on September 28, 2005 in consultation for treatment of Mr. Trout's open wound. *Id. at* ¶4. One of the options presented at that time by Dr. Miraliakbari to Mrs. Trout, whose husband was unconscious, was closure of the wound via free flap muscle transfer and skin grafting. *Id.* Alternatively, Mrs. Trout could have opted on behalf of her unconscious husband to undergo a right below knee amputation. *Id. at* ¶3. Mrs. Trout opted to proceed with attempts at reconstruction of Mr. Trout's right lower leg via free flap muscle transfer and skin grafting. *Id. at* ¶5. She consented to the performance of such a surgical procedure on behalf of her husband. *Id.*

The free flap procedure was ultimately performed on October 6, 2005 under the direction of attending plastic surgeon defendant Miraliakbari. *Id. at* ¶6. Assisting during the procedure were second year plastic surgery fellow defendant

Johnson and fourth year surgery resident Dr. Douglas McGuirk. *Id.*

At the time of the October 6, 2005 surgical procedure, defendant Johnson had completed medical school and his general surgery residency and was undertaking additional training in the subspecialty of plastic surgery. *Id. at ¶10.* Specifically, defendant Johnson completed his residency in general surgery at the Temple University Hospital between June 1998 and July 2001. *Id.* Following his residency at Temple University Hospital, defendant Johnson undertook one year of research fellowship in plastic and reconstructive surgery at the Harvard Medical School. *Id.* In July 2004, defendant Johnson then came to the MHMC to undergo a two year fellowship in plastic and reconstructive surgery. *Id.* Accordingly, at the time of Mr. Trout's October 6, 2005 surgery, defendant Johnson was in the midst of his second year of fellowship training in plastic and reconstructive surgery. *Id. at ¶11.*

Defendant Johnson merely assisted primary surgeon defendant Miraliakbari in the performance of the procedure on Mr. Trout and neither performed the allegedly negligent anastomosis in question nor decided which vessel to anastomose

to the muscle flap. *Id. at ¶9.* Defendant Miraliakbari indicated, during his deposition, that it was he rather than the assistants – Drs. Johnson and McGuirk – who determined which vessels were appropriate for anastomosis and ultimately performed the allegedly negligent anastomosis during Mr. Trout's October 6, 2005 surgery. *Id. at ¶12.* Similarly, defendant Johnson testified that he did not participate in the dissection to identify the presumed posterior tibial artery for purposes of performing the anastomosis. *Id. at ¶13.* Instead, while defendant Miraliakbari was dissecting the vessels in Mr. Trout's right lower leg and identifying the appropriate vessel for anastomosis, defendant Johnson was assisting Dr. McGuirk in the harvest of Mr. Trout's latissimus dorsi muscle on Mr. Trout's right flank. *Id. at ¶14.* Defendant Johnson's sole role in the identification of the vessels in Mr. Trout's right lower leg was limited to preparing the vessels, which had already been dissected free of surrounding tissue and identified as the posterior tibial artery by defendant Miraliakbari, for anastomosis prior to removal of the latissimus muscle on Mr. Trout's flank. *Id. at ¶15.* Defendant Johnson testified during his deposition that he did not participate in the identification of the vessels either at the time the Doppler was applied, when defendant Miraliakbari observed that the vessel initially looked

like a vein, or during the aspects of the surgery when there was "difficulty in the complexity of the surgical dissection...." *Id. at ¶22.* Specifically, defendant Johnson testified that he did not participate in or observe defendant Miraliakbari's identification of the posterior tibial artery. *Id.*

Following the October 6, 2005 surgical procedure, defendant Johnson's involvement in Mr. Trout's treatment was limited to one day because he was scheduled to be out of the hospital on vacation beginning in the evening of October 7, 2005. *Id. at ¶16.* Defendant Johnson was no longer involved in Mr. Trout's care and treatment after examining him at approximately 9:30 a.m. on October 7, 2005 because he was scheduled to be out of the hospital on vacation for nine days. *Id. at ¶28.*

The plaintiffs have adduced no evidence demonstrating that defendant Johnson in fact participated in the identification of the presumed posterior tibial artery or the dissection and division of the vessel. *Id. at ¶23.* The plaintiffs have also adduced no evidence that those aspects of the surgery were occurring under the direction of defendant

9

Johnson rather than the attending primary surgeon, defendant Miraliakbari. *Id. at ¶24.*

IV. Discussion.

Defendant Johnson contends that he is entitled to summary judgment because the plaintiffs have failed to produce expert opinion supporting a *prima facie* claim of medical malpractice against him.

Under Pennsylvania law[2], in order to establish a prima facie case of medical malpractice, a plaintiff must establish: (1) a duty owed by the medical provider to the patient; (2) a breach of that duty; (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and (4) damages suffered by the patient that were a direct result of that harm. *Mitzelfelt v. Kamrin*, 584 A.2d 888, 891 (Pa. 1990). "With all but the most self-evident medical malpractice actions there is also the added requirement that the plaintiff must provide a medical expert who

---

[2] Subject matter jurisdiction in this case is based on diversity of citizenship pursuant to 28 U.S.C. § 1332, and the parties do not dispute that Pennsylvania law applies.

will testify as to the elements of duty, breach, and causation." *Quinby v. Plumsteadville Family Practice, Inc.,* 907 A.2d 1061, 1070-1071 (Pa. 2006).

The plaintiff produced reports from three experts - Steven P. Davison, D.D.S, M.D, Bruce J. Hirshfeld, M.D., F.A.C.S., and Louis S. Halikman, M.D.

Defendant Johnson contends that none of the expert reports produced by the plaintiffs specifically criticizes the care provided by him or opines that he committed a negligent act.  In response, the plaintiffs contend that two reports from Dr. Davison outline breaches in the standard of care by defendant Johnson.

The plaintiff produced two reports from Dr. Davison. One report is dated May 7, 2007.  *Doc. 50, Exhibit C.*  The other report is dated February 18, 2008 and is basically a repeat of the May 7, 2007 report with some additions. *Doc. 50, Exhibit D.* We examine the February 18, 2008 report of Dr. Davison.

After reviewing the plaintiff's medical history leading up to the surgery on October 6, 2005 and reviewing Dr.

11

Miraliakbari's operative report of the surgery on October 6, 2005, Dr. Davison's report of February 18, 2008 provides:

> **Breach in standard of care:**
> **1. Doppler is transmitted and could not be used to accurately identify the artery. The vessel being dissected out was the vein and the Doppler was transmitting from the vessel which was underneath the involved vessel. Pulsatile flow was transmitted to the surrounding tissue. Therefore, Doppler was not an appropriate study to use this time.**
> **2. Notes specifically state that for all intents and purposes, this looks like a vein that has been dissected out this was because it was indeed a vein.**
> **3. Considering the difficulty in the complexity of the surgical dissection, which was recorded in extensive detail, an intraoperative vascular consult would be appropriate.**
> **4. The decision to use the vessel in the zone of injury was inappropriate in this case, particularly as it was so difficult and it had multiple areas of clotting, which had to be resected cephalad. It would have made more sense to go outside the zone of injury and would have substantially increased the likelihood of success with this particular reconstruction.**
> **5. Blood shooting across the table could occur with increased venous pressure.**
> **6. Both arteries and veins have Doppler flow though different in nature.**
> **7. The deep veins in the leg are generally bigger than the arteries and paired.**

*Doc. 50, Exhibit D at 3-4.*

Dr. Davison then sets forth a review of the following chronology of the period immediately after the operation as follows:

> On 10/06/05 at 1815H, operation was complete. Operative note was made.
>
> On 10/06/05 at 1041H[3], the patient in unit was extubated, flap viable.
>
> On 10/06/05 at 2300H, attending examination, flap viable.
>
> On 10/07/05 at 0935H, resident examination, flap viable. Transferred to IMC, which was a stepdown status. The patient was now moved from the ICU.
>
> On 10/07/05, plastic surgery attending, arterial venous flow by Doppler signal, flap warm and viable. Transfer of care to Boustard. To follow the patient with residents.

*Id.* at 4.

After the above chronology, Dr. Davison's report provides:

> **Breach in Standard of Care: At this point, there was very little followup with the residents of this particular postoperative patient, certainly this is below the standard of care for flap maintenance. There was no**

---

[3] The identified time here does not appear to fit into the chronology.

>           **follow up of the patient with residents as stated.**

*Id.*

Dr. Davison then reviews the medical care provided to the plaintiff on October 8th and 9th including the surgery on October 9, 2005 during which it was determined that the artery of the flap had been anastomosed to the posterior tibial vein rather than the posterior tibial artery. *Id. at 4-5.* Dr. Davison's report then provides:

>           **Breach of standard of care: A vascular consult was received intraoperatively.  This should have been done at the time of initial surgery because of the complexity of the injury, difficulty in finding the vessels, and the resultant confusion of which was the vein and the artery second.  Dr. Boustard clearly points out that there were multiple indications that this was the wrong vessel including the fact that the recipient vessel looks larger than normal and had more small side branches are [sic] normal.**
>
>           **Dr. Miraliakbari noted that there was difficulty.  Other finding is the fact that the flap is completely necrotic which showed that it had an inadequate monitoring and they were unable to salvage it, which would have been the case if the flow to the flap had been identified as going down before the case became necrotic.**

*Id. at 5.*

14

Dr. Davison then repeats his opinion that an intraoperative consult would have been appropriate during the first surgery. *Id. at 6.* After a section of the report reviewing defendant Miraliakbari's explanation in the chart for the mistake, Dr. Davison's report provides:

> **Breaches in the standard of care are the following: There is a window of opportunity to salvage the flap. Approximately 50% as [sic] the flaps can be saved if explored in the early-enough window for salvage of muscle. The window for salvage of the muscle flap is a maximum of six hours. After this time, no likelihood of survival salvage is possible. Therefore, there was inadequate follow up of this flap, particularly by the resident coverage. The physician specifically outlined that his intraoperative decision-making led to the loss of the flap by reverse venous-to-arterial anastomosis as documented in the record. He documents all the reasons a different course of action should have been taken.**
>
> Loss: Loss of the flap was directly related to the reversed anastomosis and the lack of appropriate postoperative monitoring, which is a part of the standard of care. This was then impacted on the patient's course which will be defined by an alternative testimony. and the decrease in toe movement.

*Id. at* 7.

Defendant Johnson contends that he is entitled to summary judgment because neither of the reports by Dr. Davison

15

identifies a specific act of negligence committed by him or even mentions him.

As to the mistake in misindentifying the posterior tibial vein as the posterior tibial artery and attaching the vein to the artery in the flap during the October 6, 2005 surgery, we conclude that the plaintiffs have not presented expert testimony to establish that defendant Johnson, given his limited role in that part of the surgery, breached a duty of care to the plaintiffs.  As indicated above, it is undisputed that defendant Johnson neither performed the allegedly negligent anastomosis in question nor decided which vessel to anastomose to the muscle flap and that defendant Johnson's role in the identification of the vessels in Mr. Trout's right lower leg was limited to preparing the vessels, which had already been dissected free of surrounding tissue and identified as the posterior tibial artery by Dr. Miraliakbari, for anastomosis prior to removal of the latissimus muscle on Mr. Trout's flank.

The plaintiffs argue in their brief that, based on his level of knowledge, training and experience, defendant Johnson had a duty to recognize and raise with defendant Miraliakbari that the vein that defendant Miraliakbari had identified as an

16

artery was really a vein or to suggest a vascular consultation. However, the plaintiffs have presented no expert testimony that, given his undisputed limited involvement in that part of the procedure, defendant Johnson had such a duty.  No matter how liberally we construe Dr. Davison's reports, they can not reasonably be construed to contain such an assertion as to defendant Johnson.  Accordingly, we conclude that defendant Johnson is entitled to summary judgment on the plaintiffs' claim regarding negligence during the October 6, 2005 surgery.

The plaintiffs also contend that defendant Johnson was negligent by failing to ascertain the non-viability of the flap during his post-operative visit with Mr. Trout at 9:35 a.m. on October 7, 2005.  More specifically, the plaintiffs assert that "by failing to detect that the flap was failing at that time and being fooled by the suggestion that it was well perfused when adequate post-operative testing would have detected the lack of vascular flow to the flap was negligence on the part of Dr. Johnson." *Doc. 50 at 6.*  Again, however, the plaintiffs have failed to presented expert testimony to support that assertion. The reports of Dr. Davison do not mention defendant Johnson and do not indicate that defendant Johnson was negligent during his post operative visit with Mr. Trout.  Although Dr. Davison does

17

indicate that there was inadequate follow up of the flap "particularly by the resident coverage," he does not mention defendant Johnson who did follow up with Mr. Trout at 9:35 a.m on October 7, 2005 and he does not indicate what, if anything, defendant Johnson should have done differently to detect that the flap was failing.  Accordingly, we conclude that defendant Johnson is entitled to summary judgment on the plaintiffs' claim regarding negligence during his post-operative care of Mr. Trout.

V. Recommendations.

Based on the foregoing, it is recommended that the motion (doc. 46) for summary judgment filed by defendant Johnson be granted.

*/s/ J. Andrew Smyser*
J. Andrew Smyser
Magistrate Judge

Dated:  April 17, 2008.

18